# IN THE SUPREME COURT OF TEXAS

No. 19-0767

TEXAS PROPANE GAS ASSOCIATION, PETITIONER,

v.

THE CITY OF HOUSTON, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued October 29, 2020**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BUSBY, JUSTICE BLAND, and JUSTICE HUDDLE joined.

JUSTICE BLACKLOCK filed an opinion concurring in part and dissenting in part, in which JUSTICE BOYD joined.

Texas comprehensively regulates the liquefied petroleum gas (LPG)[1] industry through the

LPG Code[2] and agency regulations[3] that "preempt and supersede any [city] ordinance".[4] The Texas

---

[1] Liquefied petroleum gas is a mixture of volatile hydrocarbons, including butane and propane. When in a pressurized tank, LPG is in liquid state and can easily be stored and transported. When released at room temperature, it is gaseous and highly flammable.

[2] *See* TEX. NAT. RES. CODE ch. 113.

[3] *See* 16 TEX. ADMIN. CODE ch. 9.

[4] TEX. NAT. RES. CODE § 113.054.

Propane Gas Association (TPGA)[5] has sued the City of Houston for a declaratory judgment that its ordinances regulating the LPG industry, to include imposing criminal fines for violations, are preempted by state law. Two jurisdictional challenges the City has made to the suit are the only issues before us in this interlocutory appeal. First, the City argues that civil courts lack subject-matter jurisdiction to adjudicate TPGA's preemption claim because the local regulations it challenges carry criminal penalties. We conclude that TPGA's claim is not a "criminal law matter" that must be raised in defense to prosecution. Second, the City argues that TPGA cannot challenge the City's LPG regulations "en masse" but only those that have injured at least one of its members. Although the City frames this argument as a challenge to TPGA's standing, we conclude that it is really a merits challenge and that TPGA has demonstrated standing to bring the singular preemption claim it has pleaded. We reverse the judgment of the court of appeals[6] and remand the case to the trial court for further proceedings.

## I

The State has regulated the LPG industry for more than 60 years. In 1959, the Legislature enacted the LPG Code,[7] which directed the Railroad Commission to "promulgate and adopt . . . adequate rules, regulations, and/or standards pertaining to any and all aspects or phases

---

[5] TPGA is a trade association whose 300 members statewide include "producers, wholesalers, propane retailers, manufacturers, fabricators, distributors, service providers, engineers, plumbers, RV parks, associations, and others involved in the propane industry." *Who are Our Members*, TPGA, https://www.txpropane.com/why-join (last visited Apr. 4, 2021). Its purpose is "to help the propane industry navigate complex rules, regulations, and codes" and to serve "as the voice for the propane industry in Texas." Homepage, TPGA, https://www.txpropane.com/ (last visited Apr. 5, 2021).

[6] 608 S.W.3d 27, 39 (Tex. App.—Austin 2019).

[7] The Liquefied Petroleum Gas Code, 56th Leg., R.S., ch. 382, 1959 Tex. Gen. Laws 844, 845 (codified as amended at TEX. NAT. RES. CODE ch. 113).

of the LPG industry . . . which will protect or tend to protect the health, welfare, and safety of the general public."[8] In response, the Commission has adopted comprehensive statewide LPG regulations[9] that the parties refer to as the LP-Gas Safety Rules. The LP-Gas Safety Rules prescribe various monetary penalties for violations.[10] In 2011, the Legislature added Section 113.054 to the LPG Code:

> The rules and standards promulgated and adopted by the commission under Section 113.051 preempt and supersede any ordinance, order, or rule adopted by a political subdivision of this state relating to any aspect or phase of the liquefied petroleum gas industry. A political subdivision may petition the commission's executive director for permission to promulgate more restrictive rules and standards only if the political subdivision can prove that the more restrictive rules and standards enhance public safety.[11]

Four years later, the City adopted three ordinances amending its Fire Code,[12] which is modeled on the 2012 International Fire Code. The amended Code now includes Chapter 61, entitled "Liquefied Petroleum Gases".[13] This was the City's first venture into regulating activities

---

[8] *Id.* § 3.A. This provision has since been recodified as Section 113.051, whose language is substantially the same: "[T]he commission shall promulgate and adopt rules or standards or both relating to any and all aspects or phases of the LPG industry that will protect or tend to protect the health, welfare, and safety of the general public." Exceptions to this provision in the 1959 enactment are now listed in Section 113.003. One exception is that "[n]one of the [Code's provisions] apply to . . . the production, refining, or manufacture of LPG". TEX. NAT. RES. CODE § 113.003(a)(1).

[9] *See* 16 TEX. ADMIN. CODE ch. 9.

[10] *Id.* § 9.15. The provision sets out lengthy, detailed schedules of penalties for hundreds of violations.

[11] TEX. NAT. RES. CODE § 113.054.

[12] These ordinances, Nos. 2015-1108, 2015-1289, and 2015-1316, took effect in early 2016.

[13] Hous., Tex., City of Houston Fire Code ch. 61 (2015).

involving LPG. The Code imposes monetary penalties for a violation that range from $500 to $2,000 per day.[14]

TPGA brought a declaratory judgment action against the City of Houston and several other cities,[15] asserting the defendants' local LPG regulations have not been approved by the Commissioner's executive director and, under Section 113.054, are therefore preempted by the LP-Gas Safety Rules. In response, all defendants but the City either adopted the LP-Gas Safety Rules or settled with TPGA. Only the City contested TPGA's assertions. TPGA asserts that under Section 113.054, the LP-Gas Safety Rules "preempt and supersede *any* ordinance, order, or rule adopted by a political subdivision of this state relating to *any* aspect or phase of the liquefied petroleum gas industry" (emphasis in original), whether in Chapter 61, other provisions of the Fire Code, or other City regulations, such as those in its Building Code. "Alternatively," TPGA asserts that the LP-Gas Safety Rules preempt the City's regulations that are more restrictive than the LP-Gas Safety Rules.[16]

---

[14] For example, Section [A] 109.4 provides that:
When in this code an act is prohibited or is made or declared to be unlawful or an offense or misdemeanor, or wherever in this code the doing of any act is required or the failure to do any act is declared to be unlawful, and no specific penalty is provided therefor, the violation of any such provision of this code shall be punished by a fine of not less than $500.00, nor more than $2000.00; provided, however, that no penalty shall be greater or lesser than the penalty provided for the same offense under the laws of the state. Each day any violation of this code shall continue shall constitute a separate offense.

*Id.* § 109.4.

[15] Other defendants were the Cities of Abilene, Bonham, El Paso, Greenville, Lake Jackson, Lubbock, Lucas, Mesquite, Mission, Montgomery, Sherman, West Columbia, and Woodway.

[16] TPGA's Fourth Amended Petition states:

Alternatively, and without waiving the above and foregoing, in the event only those Houston ordinances, rules, and regulations that are more restrictive than the LP-Gas Safety Rules are preempted, Plaintiff asserts that the following are more restrictive and, therefore, preempted:

1.      Houston Sections [A] 105.1.1, [A] 105.1.2, [A] 105.6.27, and 6101.2 relating to permits and fees are more restrictive than and, therefore, preempted by LP-Gas Safety Rule § 9.101;

2.      Houston Sections [A] 105.6.27, 6101.2, and 6103.3 relating to aggregate water capacity of LP-Gas containers are more restrictive than and, therefore, preempted by LP-Gas Safety Rule § 9.101;

3.      Houston Sections [A] 105.6.27 and 6101.3 relating to the required submission of applications and/or construction documents are more restrictive than and, therefore, preempted by LP-Gas Safety Rules §§ 9.3 and 9.101;

4.      Houston Sections 113.1 – 113.113.7 relating to fees are more restrictive than and, therefore, preempted by LP-Gas Safety Rules §§ 9.101 and 113.082;

5.      Houston Section 312 relating to barriers is more restrictive than and, therefore, preempted by LP-Gas Safety Rule § 9.140;

6.      Houston Sections 203.1 and 6104.2 relating to maximum storage capacity within certain districts of limitation are more restrictive than the LP-Gas Safety Rules because the LP-Gas Safety Rules impose no similar restriction in any area of limitation defined by Houston;

7.      Houston Sections [A] 104.1 and 104.1.1 relating to the authority of Houston's fire code official to enforce provisions of Houston's Fire Code, to render interpretations of any matter, and/or to exercise discretion with respect to any aspect or phase of the LP-Gas industry are more restrictive than the LP-Gas Safety Rules because the LP-Gas Safety Rules: (i) impose an enforcement regime, including various penalties, and (ii) delegate no enforcement authority to Houston's fire code official;

8.      Houston Section [A] 104.5 relating to the authority of Houston's fire code official to issue criminal citations, administrative citations, or summonses with respect to any aspect or phase of the LP-Gas industry for violation of any provision of the Houston Fire Code is more restrictive than the LP-Gas Safety Rules because the LP-Gas Safety Rules: (i) impose an enforcement regime, including various penalties, and (ii) delegate no enforcement authority to Houston's fire code official;

TPGA's pleadings recount the history of Section 113.054's enactment from its perspective. The LPG industry, TPGA explains "is heavily regulated", both by the State and also "by local governments that [have] . . . adopted local rules that substantially differ[] from the . . . LP-Gas Safety Rules." TPGA asserts in its pleadings that "one of the challenges facing the LP-Gas industry [is] local rules that deviate from internationally and nationally accepted LP-Gas standards for no rhyme or reason". "The inconsistent, hodge-podge nature of local rules, especially local rules that deviate substantially and irrationally from the rules adopted by" the State burden the industry. The goal of Section 113.054, TPGA alleges, is a "consistent regulatory scheme for the LP-Gas industry" to relieve the industry of "the burden of inconsistent local regulation". TPGA further alleges that in a meeting between its representatives and the City's mayor and attorney, the City officials "made clear that Houston would continue to regulate the LP-Gas industry within its jurisdiction as it wished without regard to § 113.054".

TPGA's pleadings assert that "[o]ne or more of [its] members have been adversely affected by" the City's enactment of local regulations that differ from the LP-Gas Safety Rules and describe five instances in which the City has enforced LPG regulations that differ from the LP-Gas Safety Rules. In four of the five, it is unclear whether the incident involved one of TPGA's members. The fifth example involves a member who was charged $2,180 in permit fees for installing an LPG

9.     Houston Section [A] 105.3.1 relating to expiration of an LP-Gas permit is more restrictive than the LP-Gas Safety Rules because the LP-Gas Safety Rules grant no such authority to Houston; and

10.    Houston Section [A] 105.5 relating to revocation of an LP-Gas permit is more restrictive than the LP-Gas Safety Rules because the LP-Gas Safety Rules grant no such authority to Houston.

6

tank in a manner that violated the amended Fire Code, even though the installation complied with the LP-Gas Safety Rules.

The parties filed cross-motions for summary judgment on the merits. The City's motion also included a plea to the jurisdiction. The trial court denied both sides' motions and the City's plea to the jurisdiction. The City appealed the trial court's refusal to dismiss for lack of jurisdiction.[17] On appeal, the City argued that because its regulations can result in the imposition of fines, they are criminal in nature and beyond challenge in a civil action. The City also argued that TPGA lacks standing to challenge the City's regulations without showing injury to a TPGA member for each discrete regulation challenged. The court of appeals disagreed with the former argument[18] but agreed with the latter[19] and remanded the case to the trial court for TPGA to amend its pleadings.

We granted TPGA's and the City's petitions for review. We begin with the City's criminal law argument and then turn to its standing argument. It bears emphasizing that the merits of TPGA's preemption claims are not at issue here—only its right to proceed on them.

**II**

**A**

---

[17] *See* TEX. CIV. PRAC. & REM. CODE § 51.0148(a)(8) (authorizing an interlocutory appeal from a ruling on a governmental unit's plea to the jurisdiction); *Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006) (noting that "governmental unit[s]" are entitled to interlocutory appeal following the trial court denying their jurisdictional challenges "irrespective of the procedural vehicle used").

[18] 608 S.W.3d 27, 38–39 (Tex. App.—Austin 2019).

[19] *Id.* at 33–37.

The Texas Constitution prohibits city ordinances that conflict with state law.[20] In *City of Laredo v. Laredo Merchants Association*, we held that "a local antilitter ordinance prohibiting merchants from providing 'single use' plastic and paper bags to customers for point-of-sale purchases" was preempted by the Texas Solid Waste Disposal Act and therefore invalid.[21] We concluded that the Merchants Association challenging the ordinance was entitled to declaratory relief.[22]

Just like the LPG ordinances in the present case, the City of Laredo's ordinance punished violations with monetary fines.[23] The City of Laredo did not contest the trial court's jurisdiction over the suit, but the City of Houston did, as amicus curiae, making exactly the same argument it makes now: that because the ordinance was "penal in nature", it could be challenged "only in defense to a criminal prosecution for violating it."[24] The City centered its argument on our decision in *State v. Morales*, where we held that the trial court lacked jurisdiction over a declaratory judgment action challenging the constitutionality of the Texas statute criminalizing sodomy.[25] "It is well settled," we wrote, "that courts of equity will not interfere with the ordinary enforcement of a criminal statute unless the statute is unconstitutional and its enforcement will result in

---

[20] TEX. CONST. art. XI, § 5(a) ("[N]o . . . ordinance passed under [a city] charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State.").

[21] 550 S.W.3d 586, 589 (Tex. 2019).

[22] *Id.* at 598.

[23] *Id.* at 590 ("A violation is punishable as a Class C misdemeanor with a fine of up to $2,000 per violation plus court costs and expenses.").

[24] *Id.* at 592 n.28.

[25] 869 S.W.2d 941, 942 (Tex. 1994).

8

irreparable injury to vested property rights."[26] "The underlying reason for this rule," we explained, "is that the meaning and validity of a penal statute or ordinance should ordinarily be determined by courts exercising criminal jurisdiction."[27] "For the same reasons that equity courts are precluded from enjoining the enforcement of penal statutes," we concluded, the trial court lacked "jurisdiction to render a declaratory judgment regarding the constitutionality of [the sodomy statute]."[28]

*Morales* distinguished our decision a century earlier in *City of Austin v. Austin City Cemetery Association.*[29] There, the Cemetery Association challenged an ordinance prohibiting burials within the Austin city limits north of the Colorado River except in the State Cemetery, the Austin City Cemetery, and the Mount Calvary Cemetery.[30] We held that the trial court had jurisdiction to enjoin enforcement of the ordinance, despite the "general rule" that "the aid of a court of equity cannot be invoked to enjoin criminal prosecutions."[31] Though the ordinance could be challenged in a criminal prosecution or on habeas corpus, we acknowledged, "[a] criminal prosecution is unpleasant to all people who have due respect for the law, and almost necessarily involves inconvenience and expense."[32] As a result, "[a]s long as the ordinance remains

---

[26] *Id.* at 945 (quoting *Passel v. Fort Worth Indep. Sch. Dist.*, 440 S.W.2d 61, 63 (Tex. 1969)).

[27] *Id.*

[28] *Id.* at 947.

[29] 28 S.W. 528 (Tex. 1894).

[30] *Id.* at 528.

[31] *Id.* at 529.

[32] *Id.* at 530.

9

undisturbed, it acts in terrorem, and practically accomplishes" its goal by only threatening enforcement.[33] Unless the ordinance was restrained, it could "result in a total destruction of the value of [the Cemetery Association's] property for the purpose for which it was acquired."[34] The sodomy statute challenged in *Morales* posed no such threat, we explained, because it was not being enforced; there was "no record of even a single instance in which the sodomy statute ha[d] been prosecuted against conduct that the plaintiffs claim[ed] [was] constitutionally protected".[35]

Unlike the statute in *Morales*, the antilitter ordinance in *City of Laredo* threatened irreparable injury to vested property rights in a way similar to the ordinance in *City of Austin*. The City of Laredo's ordinance "impose[d] a substantial per-violation fine that effectively preclude[d] small local businesses from testing the ban's constitutionality in defense to a criminal prosecution."[36] *Morales* was thus no impediment to the trial court's jurisdiction over the Merchants Association's suit for declaratory relief.

With more rhetoric than logic, the City of Houston insists that *City of Laredo* should not be followed and was wrongly decided. The City dismisses our jurisdictional holding as dicta. But a jurisdictional holding can never be dicta because subject-matter jurisdiction must exist before we can consider the merits, a challenge to it cannot be waived, and "we have an obligation to examine our jurisdiction any time it is in doubt".[37] The City argues that *City of Laredo* is directly

---

[33] *Id.*

[34] *Id.* at 529.

[35] 869 S.W.2d 941, 943 (Tex. 1994).

[36] 550 S.W.3d 586, 592 n.28 (Tex. 2018).

contrary to *Morales*, even though the sodomy statute at issue in *Morales* was never enforced, and the City of Laredo adopted its antilitter ordinance precisely to enforce it. The City argues that the City of Austin's cemetery ordinance threatened the total destruction of the value of the challenger's property, while the City of Laredo's regulations posed much less of a threat to the property of the Merchants Association. But the threat of prosecution and the fines imposed in each situation were similar.

In sum, just as in *City of Laredo*, the City's LPG regulations threaten irreparable injury to vested property rights.

**B**

The City's jurisdictional argument also fails because TPGA's lawsuit is not a "criminal law matter" outside a Texas civil court's subject-matter jurisdiction.

The Texas Constitution bifurcates the civil and criminal law jurisdiction of the State, giving the Court of Criminal Appeals appellate jurisdiction "in all criminal cases"[38] and this Court appellate jurisdiction "except in criminal law matters".[39] In *Heckman v. Williamson County*, we held that to determine the boundary between civil and criminal jurisdiction, courts must "look to the essence of the case to determine whether the issues it entails are more substantively criminal or civil."[40] Disputes "aris[ing] over the enforcement of statutes governed by the Texas Code of

---

[37] *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–444 (Tex. 1993) ("Subject matter jurisdiction is never presumed and cannot be waived.").

[38] TEX. CONST. art. V, § 5(a).

[39] *Id.* art. V, § 3(a).

[40] 369 S.W.3d 137, 146 (Tex. 2012).

Criminal Procedure" or "as a result of or incident to a criminal prosecution" are usually criminal law matters.[41] But the mere existence of some criminal-law question, characteristic, or context will not transform a dispute that is fundamentally civil into a criminal law matter.[42]

In *Harrell v. State*, for example, Harrell contended that a trial court order directing the Texas Department of Criminal Justice to withdraw money from his inmate trust account to pay for court costs and attorney fees violated due process.[43] We had jurisdiction to decide the merits because the case was "more civil in nature than criminal."[44] We reasoned that the withdrawal order was issued years after Harrell's conviction; that the Government Code provision authorizing the order also authorized withdrawal for costs incurred in civil proceedings; that neither Harrell's guilt nor his punishment was at issue; and that the case was "substantively akin to a garnishment action or an action to obtain a turnover order."[45]

The "essence" test articulated in *Heckman* requires a holistic, common-sense analysis. The essence of this case is a dispute over the City's legal authority to regulate a specific category of commercial activity, the LPG industry. TPGA's primary substantive claim is that Section 113.054, a civil statute, forbids the City from regulating any aspect of the industry without the permission

---

[41] *Id.* (quoting *Harrell v. State*, 286 S.W.3d 315, 318 (Tex. 2009)).

[42] *See Passel v. Fort Worth Indep. Sch. Dist.*, 440 S.W.2d 61, 62 (Tex. 1969) ("It has been said that the power and authority to interpret criminal statutes rests solely with the courts of this state exercising criminal jurisdiction. We have already confessed that this statement is much too broad." (citations omitted)); *Comm'rs' Ct. of Nolan Cnty. v. Beall*, 81 S.W. 526, 528 (Tex. 1904) (explaining that "there are . . . civil cases in which . . . points of criminal law call for a solution" and giving the example of a damages claim for false imprisonment that challenges the defendant's right to make an arrest under the Code of Criminal Procedure).

[43] 286 S.W.3d 315, 318 (Tex. 2009).

[44] *Id.*

[45] *Id.* at 318–319.

12

of the executive director of the Railroad Commission. TPGA's alternative claim is that certain of the City's regulations are preempted by Section 113.054 because they conflict with the Railroad Commission's LP-Gas Safety Rules. Adjudicating the merits of TPGA's claims will turn on the scope of Section 113.054.

Though violating the City's LPG regulations may result in a criminal proceeding or monetary penalty, that fact is merely incidental to the legal issue TPGA raises. Accepting the City's argument would allow a political subdivision to evade a preemption challenge by cloaking its commercial regulations with criminal features. And it would result in the anomaly of civil courts having jurisdiction to adjudicate the validity of local LPG regulations that do not carry criminal penalties but no jurisdiction to adjudicate local regulations that do.

Both *Morales* and *City of Laredo* repeated the rule that a civil court has jurisdiction to declare a criminal statute invalid only when irreparable injury to vested property rights is threatened.[46] Viewed in the context of our case law as a whole, the rule is but a corollary to the ultimate test articulated in *Heckman*: looking to the essence of the case, are the issues presented more substantively civil or criminal? Protection of property rights is a core civil-law function.[47] In a suit challenging the constitutionality of a criminal statute, the threat of irreparable injury to property rights may tip the scales in favor of the matter being a civil one.

---

[46] *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 592 n.28 (Tex. 2018); *State v. Morales*, 869 S.W.2d 941, 945 (Tex. 1994).

[47] The principal historical function of equity courts was the "protection of rights of property." *In re Sawyer*, 124 U.S. 200, 210 (1888); *see Passel*, 440 S.W.2d at 63 ("It has . . . been said that courts of equity are concerned only with the protection of civil property rights.").

The essence of this case is civil, as was the essence of *City of Laredo*. Accordingly, this case is within the trial court's subject-matter jurisdiction.

### III

The City challenges TPGA's standing to assert its claim that the City's regulations are preempted by Section 113.054. "The Texas standing requirements parallel the federal test for Article III standing, which provides that a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."[48] The City challenges only the injury component of standing, which must be "actual or imminent, not conjectural or hypothetical".[49] The City argues that TPGA must demonstrate that at least one of its members meets the injury requirement with respect to each discrete regulation that TPGA challenges. There are hundreds. For authority, the City relies on the basic principle that "[s]tanding is not dispensed in gross"[50] but must instead be analyzed "claim-by-claim . . . to ensure that a particular plaintiff has standing to bring each of his particular claims."[51]

We agree, of course, that standing must be analyzed claim by claim. But TPGA maintains that it has only one claim in this lawsuit: that *all* of the City's local regulations relating to LPG are preempted by the LP-Gas Safety Rules under Section 113.054. TPGA has pleaded an actual and imminent injury to its members: "inconsistent, hodge-podge . . . local rules", including the City's,

---

[48] *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (cleaned up).

[49] *Id.* at 808 (cleaned up).

[50] *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 153 (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

[51] *Id.* (emphasis removed).

14

"that deviate substantially and irrationally from the rules adopted by" the State and thereby burden the industry. TPGA's pleadings also recount a meeting in which the City officials "made clear that Houston would continue to regulate the LP-Gas industry within its jurisdiction as it wished without regard to . . . § 113.054". And TPGA's pleadings outline five instances in which the City has enforced LPG regulations in the amended Fire Code that are inconsistent with the LP-Gas Safety Rules.

The City did not specially except to TPGA's pleadings but instead challenged its standing by motion for summary judgment. Our procedural law is quite clear that "[w]hen a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. An opposing party should use special exceptions to identify defects in a pleading so that they may be cured, if possible, by amendment."[52] We think that TPGA's pleadings, read liberally, show that it has satisfied the injury requirement for standing: its members face the actual and imminent burden of inconsistent regulations that Section 113.054 was intended to prevent.

We agree with the dissent that standing requirements should be rigorously applied and that Texas law and federal law are parallel. We also agree with the dissent that "[a]s a practical matter, it seems likely that the members of the Texas Propane Gas Association face injury or threatened injury from most—if not all—of Houston's LPG regulations."[53] According to TPGA's pleadings, the City's mayor and city attorney promised them exactly that. We disagree that TPGA failed to allege an actual and imminent injury. We agree with the dissent that a plaintiff cannot challenge a

---

[52] *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000) (citations omitted).

[53] *Post* at 2.

15

broad array of regulations, or even a companion regulation, without showing standing as to each. We agree, to be specific, with *In re Gee*.[54] But *Gee* was, as the opinion said in its first sentence, "an extraordinary case."[55] There, "[a]n abortion clinic and two of its doctors [sought] a federal injunction against virtually all of Louisiana's legal framework for regulating abortion", challenging "legal provisions that do not injure them now and could not ever injure them."[56] But that is far different from this case. TPGA challenges the City's amendments to its Fire Code for reasons that TPGA also used to successfully advocate for the enactment of Section 113.054—because of the burden those amendments impose on its members and because of the actual and imminent injury promised by the City's mayor and city attorney. We disagree with the dissent that TPGA has standing to assert its claim "on the theory that, if all the regulations are invalid, they are all invalid for the same reason".[57] TPGA has standing not merely because there is one reason that the regulations are invalid, but because of what that reason is: that the City lacked the authority to adopt the regulations without State approval. TPGA has standing to challenge regulations it claims the City had no authority to enact.

TPGA has standing to assert its claim. Whether the law allows such a claim and, of course, whether TPGA can prevail on it are issues going to the merits, not standing.[58]

---

[54] 941 F.3d 153 (5th Cir. 2019) (per curiam).

[55] *Id.* at 156.

[56] *Id.*

[57] *Post* at 2.

[58] *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 777 (Tex. 2020) ("[W]hether a party can prove the merits of its claim or satisfy the requirements of a particular statute does not affect the court's subject-matter jurisdiction." (citing *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484–485 (Tex. 2018))).

\*    \*    \*    \*    \*

We conclude that the trial court does not lack jurisdiction on either ground asserted by the City. We therefore reverse the court of appeals' judgment and remand to the trial court for proceedings on the merits.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: April 16, 2021